UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

MANUELA Q. FRANCO,                               Case No. 03-13492 tr7
                                                                                                               (consolidated with 13-12941)
    Debtor.

CELIA HOUGLAND, personal representative
of the estate of Manuela Q. Franco,

    Plaintiff and Counterdefendant,

v.

CARLA FRANCO, individually
and as personal representative of
the probate estate of Hipolito Q. Franco, and
DRENNAN, LANGDON, & FIDEL, LLP,

    Defendants, Counterplaintiffs, and
    Third-party Plaintiffs,

v.                                                                                            Adv. No. 17-1001-t

HV FRANCO MINERALS,
CELIA FRANCO HOUGLAND, and
ROBERT D. HOUGLAND,

    Third-party Defendants.

**OPINION**

Before the Court is who owns certain mineral rights in and under 122 acres of land in Eddy County, New Mexico. The claimants are two probate estates, the debtor's and her son's. After years of litigation in state and bankruptcy court, the Court tried the issue on the merits and now concludes that son's estate, title holder of record since 1996, owns the mineral rights.

A.  Facts.[1]

The Court finds:

In 1969 Manuela Franco and her husband Epolito (the "Francos")[2] bought about 240 acres of irrigated farm land in Eddy County (the "Franco Farm"). The warranty deed to them excepted from the conveyance "an undivided one-half of all oil, gas and other minerals in and under the above described lands[.]" The Francos thus acquired the surface estate of, and half the mineral rights in and under, the Franco Farm.

The Francos had five children. Celia Hougland is one of four daughters; Hipolito was the only son. Over the years the Francos conveyed the following parcels of the Franco Farm to the following people:

- In 1982 they conveyed a one-acre tract to Hipolito and his wife Carla;
- In 1995 they conveyed about 64 acres to a Mr. Eddy Sing;
- In 1996 they conveyed tracts (size unknown) to three of their four daughters, including Ms. Hougland; and
- In 1996 they conveyed 122.48 acres (the "Property") to Hipolito, as his sole and separate property, by warranty deed (the "1996 Deed").[3]

*None of the conveyances excepted or reserved mineral rights.*

According to Manuela (whose 2018 deposition testimony is in evidence) and Ms.

---

[1] The Court takes judicial notice of the docket in this adversary proceeding and the consolidated bankruptcy cases, including the Court's record from previously litigated issues. *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may *sua sponte* take judicial notice of its docket and of its "own records of prior litigation closely related to the case before it").
[2] The Court sometimes uses the first names of the Francos to avoid confusion.
[3] Hipolito and Carla paid the Francos a small amount for the Property. Carla could not remember how much.

Hougland, the Francos had an unwritten agreement with Hipolito that the 1996 Deed did not convey any mineral rights in and under the Property (the "Disputed Minerals"), or else that Hipolito would reconvey the Disputed Minerals to the Francos at some point in the future.[4] Carla denies Hipolito ever agreed to any such thing and asserts that his probate estate is the sole owner of the Disputed Minerals.

Epolito died in 1997.

Because there is no direct evidence contradicting the conveyance of the Disputed Minerals by the 1996 Deed, the Manuela estate focuses on three *ex post facto* loan/title documents. In 1998 Hipolito and Carla were approved for a $31,000 loan from Western Commerce Bank, to be secured by a mortgage on the surface estate of the Property. The bank ordered a title policy to insure its mortgage[5] and apparently ordered a survey of the Property.

The survey caught an error in one of the calls in the 1996 Deed's legal description. The legal description in the title commitment is the corrected one. The corrected description prefaces its metes and bounds description of the Property with the words "The Surface Estate Only Of." That is consistent with the bank's agreement, reflected in the title commitment, to encumber only the surface estate of the Property. The commitment also states that fee simple title to the Property is vested in Hipolito.

The title commitment required that a correction warranty deed from Manuela to Hipolito be recorded. It did not specify the error to be corrected, but presumably it was the mistaken call in the 1996 Deed.

---

[4] Ms. Hougland testified that the Franco children understood that their conveyances did not include mineral rights. None of her sisters were called as witnesses at trial so there was no corroborating evidence. Ms. Hougland's testimony is self-serving because she admitted that she would inherit all mineral rights in Manuela's probate estate.

[5] Only the title commitment is in evidence.

On August 7, 1998, Hipolito and Carla granted the bank a mortgage on the surface estate of the Property. The mortgage used the legal description in the title commitment. On the same day Manuela signed a correction deed (the "1998 Deed") to Hipolito, which states in part: "See attached legal description [. . .] This deed given to correct legal description on [the 1996 deed.]" The legal description in the 1998 Deed is identical to the description in the title commitment, including the "surface estate only" language. Hipolito did not sign the 1998 Deed.

It is safe to conclude that one function of the 1998 Deed was to correct the error in the 1996 Deed's legal description. But why is the "surface estate only" language in the deed? The parties have very different explanations. Ms. Hougland argues that main purpose of the 1998 Deed was to make clear that Hipolito did not own, and had never owned, the Disputed Minerals. Carla argues, on the other hand, that the "surface estate only" language ended up in the 1998 Deed because the title company used same legal description in the title commitment, deed, and mortgage.

The Court finds Carla's explanation more plausible. If Hipolito had agreed to "give back" the Disputed Minerals, he should have signed the 1998 Deed. The fact that he did not, together with the need to correct the legal description and the clear evidence that the bank's mortgage only encumbered the surface estate, all lead the Court to find that Hipolito did not intend the 1998 loan documents in general, and the 1998 Deed in particular, to reconvey the Disputed Minerals to Manuela. Rather, it seems quite probable that the "surface estate only" language in the 1998 Deed was a mistake caused by the title company using the same legal description in the deed as in the title commitment and the mortgage.

On August 15, 1995, the New Mexico Office of the State Engineer (OSE) named the Francos as defendants in an action concerning the water rights associated with the Property. In December 2000, Manuela notified the State Engineer that Hipolito owned the water rights at issue.

In January 2001, the OSE filed a motion to substitute Hipolito for the Francos in the water rights litigation. The 1996 Deed and the 1998 Deed were attached to the motion and mailed to Carla and Hipolito.

Manuela filed a chapter 7 bankruptcy case on April 30, 2003. She did not schedule any mineral rights of any kind. The trustee issued a "no asset" report on June 30, 2003 and Manuela received a discharge in August 2003.

In 2006 Manuela leased the Disputed Minerals and other mineral rights to an oil company. Carla and Hipolito were not aware of this lease.

On September 7, 2010, Manuela recorded a document titled "Clarification Letter Warranty Deed's & Mineral Rights" in the Eddy County clerk's office. In the letter Manuela stated:

> Through out [sic] the life of my husband Epolito V. Franco and myself (Manuela Q. Franco), our land has been bought and sold and split several times, [we] never sold or included Mineral Rights in any of the Warranty Deeds.
> Please note that this letter is to show [clarification] of Warranty Deeds that all Mineral Rights were excluded from all deed[]s. I Manuela Q Franco, hold complete reservation of all oil and gas mineral rights. Please see deeds[] for details on surface property description.
> Upon my husband's passing in November of 1997, I Manuela Q. Franco, became [sole] holder of one-half of the mineral right originally received from O.J. McCarty & Mary McCarty.

On June 29, 2011, Manuela filed in the Eddy County clerk's office an affidavit and 18 exhibits related to the Franco Farm. The affidavit and exhibits were clearly intended to support Manuela's claim to, inter alia, the Disputed Minerals.[6]

A "mineral deed" signed by Manuela and recorded at the same time as the affidavit purports

---

[6] Some of the exhibits appear to be forgeries. For example, a 1990 "DEED TRANSTER" [sic] allegedly was witnessed by a "Sharon Hill," but Ms. Hill (née Urquidez) did not marry Mr. Hill until 1996, so it is highly unlikely she would have signed using her married name. Similarly, a "RESERVATION" purportedly executed in 1969 was prepared using word processing technology not available at the time. The conclusion seems inescapable that Ms. Hougland forged these documents, which does not help her credibility.

to transfer the Disputed Minerals to an "HV Franco, Minerals." Ms. Hougland and her husband, Robert Hougland, were the officers of the entity.

In September 2013 Manuela filed a second chapter 7 case. As in 2003, she failed to disclose ownership of any mineral rights. She received a discharge in December 2013.

In 2013, Hipolito and Carla leased the Disputed Minerals to an oil company. In 2013 or 2014 a company representative advised them of a potential problem with their title to the Disputed Minerals. Carla and Hipolito (then suffering a terminal illness) searched the Eddy County records and found Manuela's clarification letter, affidavit, and mineral deed. They filed a lawsuit in state court in 2014 against Manuela, Ms. Hougland, and others, seeking, inter alia, to quiet title to the Disputed Minerals. In her defense to the quiet title action, Manuela asserted ownership of the Disputed Minerals.

Hipolito died in 2015. Carla is the personal representative of Hipolito's probate estate.

During the quiet title litigation, Carla's counsel learned of Manuela's 2013 bankruptcy case and notified her lawyer. In 2016 Manuela reopened her bankruptcy case and amended her schedules to include the Disputed Minerals.[7] In December 2016, Carla removed the quiet title action to this Court.

In December 2017, Sing filed an action to quiet title to the mineral rights in the 64 acres he bought from the Francos in 1995. In response, Manuela filed a disclaimer of interest. Nevertheless, in her deposition Manuela testified that she still owned the Sing mineral rights. She also testified that the Disputed Minerals "are all hers, or they should be" because she "never gave any rights to anybody about the minerals." This testimony undercuts Manuela's credibility.

Manuela died in 2019. Ms. Hougland is the personal representative of Manuela's probate

---

[7] The U.S. Trustee's office reopened the 2003 case and reappointed the trustee so he could administer the potential omitted assets.

estate.

B.  <u>The 1996 Deed Conveyed the Disputed Minerals.</u>

In New Mexico, "[a]ny person or persons . . . holding . . . any right or title to real estate in [the] state, be it absolute or limited, in possession, remainder or reversion, may convey the same in the manner and subject to [certain statutory restrictions.]" N.M.S.A. § 47-1-4. All conveyances of real estate shall be subscribed by the person transferring his title or interest in said real estate, or by his legal agent or attorney. N.M.S.A. § 47-1-5; *see also Gonzales v. Gonzales*, 867 P.2d 1220, 1227 (N.M. App. 1993) ("the common law [s]tatute of [f]rauds requires that transfers of real property be in writing").

The 1996 Deed was in writing and signed by the Francos in the presence of a notary. It therefore is presumed to be a valid conveyance of the Property. *See Ridlington v. Contreras*, 2020 WL 2096186, *4 (N.M. App.) ("conveyances were presumptively valid" because they were in writing, signed by the conveyor, and witnessed by a neutral third party); *see generally Vigil v. Sandoval*, 741 P.2d 836, 838 (N.M. App. 1987) ("Courts will construe a deed in such a manner that will uphold the validity of the conveyance, if possible.").

In general, "once property has been conveyed by deed from the record owner, the person to whom the property has been conveyed owns it." *Gonzales*, 867 P.2d at 1227. "A deed, valid on its face, delivered to the grantee, raises a presumption that the grantor intended to part with the property." *Gutierrez v. Gianini*, 323 P.2d 1102, 1103 (N.M. 1958). "This presumption can only be overcome by evidence to the contrary that is "clear, convincing, cogent and indubitable." *Id*.

"[U]nless the contrary [is] stated in the deed" a conveyance of real estate includes "all rights, easements, privileges and appurtenances belonging to the granted estate[.]" N.M.S.A. § 47-1-34; *see also Sachs v. Bd. of Trustees of Town of Cebolleta Land Grant*, 557 P.2d 209, 218 (N.M.

1976) ("unless minerals are specifically excluded, they pass with the estate"); *see generally Eastin v. Dial*, 288 S.W.3d 491, 500 (Tex. App. 2009) ("Reservations of minerals are effective only if made in clear language."); *Gelfius v. Chapman*, 454 N.E.2d 1047, 1048 (Ill. App. 1983) ("[A] grantor may reserve any and all of the mineral rights when he conveys land, but what is not expressly reserved is conveyed."); *Bennett v. Smith*, 69 S.E.2d 42, 47 (W. Va. 1952) (a deed that contains no reservation or exception of coal within and underlying land clearly and unambiguously conveys that interest to the grantee).

"[I]t is the intent . . . expressed in the deed, and not the undisclosed intention of the grantor existing at the time of the instrument's execution [that] is controlling." *Vigil*, 741 P.2d at 838; *see also Amethyst Land Co. v. Terhune*, 326 P.3d 12, 19 (N.M. 2014) ("[T]he legal effect of a deed cannot be varied simply by showing that the drafter misunderstood the legal effect of its terms, or intended a different effect from that which the language imports.").

The foregoing authorities show that the 1996 Deed is presumed to have conveyed the Disputed Minerals to Hipolito. Only "clear, convincing, cogent and indubitable" evidence could overcome that presumption. Ms. Hougland did not present any such evidence.

C. <u>The 1998 Deed Did Not Alter the Original Conveyance</u>.

Ms. Hougland argues the 1998 Deed memorialized the parties' understanding that Hipolito did not own the Disputed Minerals, putting everyone "on the same page" about this important issue. The argument fails.

The 1998 Deed was a correction deed. Correction deeds typically are used to correct a discrete error, usually in the property description. *Joe T. Garcia's Ents., Inc., v. Snadon*, 751 S.W.2d 914, 916 (Tex. Civ. App. 1988) ("A correction deed is executed and recorded for the unique purpose of correcting a scrivener's error in the *description* of the property."); *Adams v.*

*First Nat'l Bank of Bells/Savoy*, 154 S.W.3d 859, 871 (Tex. Civ. App. 2005) ("A correction deed is filed for the sole purpose of correcting some facial imperfection in the title[.]"); *Mason v. Jarrett*, 234 S.W.2d 771, 773 (Ark. 1950) (a correction deed merely corrects a mistake, usually in the description of the land). In other words, correction deeds do "*now* perfectly what was done *then* imperfectly," *id.*, and, as such, they relate to the original deed. *Adams*, 154 S.W.3d at 871 ("Ordinarily, a correction deed relates back to the date of the document that it purports to express more accurately."); *Borden v. Hall*, 255 S.W.2d 920, 925 (Tex. Civ. App. 1951) (same). Correction deeds are also used to correct misspellings or omissions of an intended grantee's name. *Chi. Title Ins. Co. v. Accurate Title Searches, Inc.*, 164 A.3d 682, 699 (Conn. App. 2017).

"Allowing a correction deed to effectuate a different mineral exception or mineral reservation than the original deed . . . was legal error. . . . Adding a reservation or adding a property interest goes beyond the scope of what a correction deed can do." *Elsleger v. Runsick*, 479 S.W.3d 43, 50 (Ark. App. 2015); *see also Golden v. Hayes*, 277 So. 2d 816, 817 (Fla. Dist. Ct. App. 1973) (a correction deed did not affect the original deed's reservation of oil and mineral rights); *Borden*, 255 S.W.2d at 926 (As "instrument[s] of correction," correction deeds should not be construed to "alter the nature and legal effect" of the original conveyance.).

Similarly, a grantor cannot "use a correction deed to unilaterally terminate or revoke an interest conveyed by the original deed." 26A C.J.S. Deeds § 40; *see also Gallups v. Kent*, 953 So. 2d 393, 395 (Ala. 2006) (same); *Snadon*, 751 S.W.2d at 916 (Once a grantor has parted with title to a property, she has no power to unilaterally reform the conveyance; any attempt to affect the nature of the conveyance by subsequent filings must reflect the parties' mutual intent.). "Where the grantor has divested himself of title, although by mistake he has not conveyed the title in the way in which he intended, he cannot by a subsequent conveyance correct his mistake, there being

-9-
Case 17-01001-t    Doc 141    Filed 12/11/20    Entered 12/11/20 16:33:08 Page 9 of 12

no title remaining in him to convey." *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 434 (10th Cir. 1979); *see also In re Owen*, 101 B.R. 266, 269 (D. Kan. 1989) (same); *Johnson v. Hovland*, 795 N.W.2d 294, 301 (N.D. 2011) (same); *Kirkpatrick v. Ault*, 280 P.2d 637, 641 (1955) (same).

If Manuela made a mistake when she conveyed the Disputed Minerals to Hipolito, she should have asked Hipolito to reconvey the mineral rights to her by deed or brought an action for reformation. *See, e.g., Twin Forks Ranch, Inc. v. Brooks*, 907 P.2d 1013, 1017 (N.M. App. 1995) (a deed may be reformed on the ground of mutual mistake where, for example, minerals have been inadvertently included in a conveyance). She did neither. There is no evidence that between 1996 and 2015 Manuela asked Hipolito to reconvey the Disputed Minerals or went to court to reform the 1996 Deed.

D.  Hipolito's Knowledge of Manuela's Adverse Claim is Not Enough to Divest Him of Title to the Disputed Minerals.

It is not clear when Hipolito became aware of Manuela's claim to the Disputed Minerals. It could have been as early as 1998 or as late at 2014. Whenever it was, his knowledge of Manuela's adverse claim did not create an obligation to challenge it. *See Mosley v. Magnolia Petroleum Co.*, 114 P.2d 740, 752 (N.M. 1941) ("The owner of property is justified in relying upon his title; and he is under no obligation to proceed against all persons who may assert a hostile title[.]"). The fact that he waited until 2014 to quiet title to the Disputed Minerals cannot be held against him.

E.  Ms. Hougland's Estoppel Argument Fails.

Ms. Hougland argues that Hipolito's estate is estopped from asserting ownership of the Disputed Minerals. The argument fails for two reasons. First, Hipolito cannot lose his record title to the Disputed Minerals by failing to respond to legally ineffective claims. *See, e.g.*, *Dye v. Crary*, 85 P. 1038, 1040-41 (N.M. 1906) (an owner does not lose title through equitable estoppel by failing to attack a void and invalid sale of his property); *Pratt v. Parker*, 255 P.2d 311, 316 (N.M. 1953)

(a party "cannot . . . give life and effect to an invalid deed [by] urging against the owners of [property] a plea of estoppel"); *see generally*, *First Nat'l Bank in Albuquerque v. Enriquez*, 634 P.2d 1266, 1268 (N.M. 1981) (a forged deed is "ineffective ab initio, and there is no ground for . . . waiver or estoppel in order to give it operative force"); *In re Estate of Salas*, 734 P.2d 250, 253 (N.M. App. 1987) ("[t]he true owner of property is not estopped from asserting ownership solely because another, lacking any claim to the property, is allowed to exercise control over" it.).

Second, a party cannot prevail on an equitable estoppel claim unless she was

> not only destitute of knowledge of the true state of the title, but also of any convenient and available means of acquiring such knowledge. Where the condition of the title is known to both parties, or both have the same means of ascertaining the truth, there can be no estoppel.

*Brant v. Virginia Coal & Iron Co.*, 93 U.S. 326, 337 (1876); *see also Dye*, 85 P. at 1042 (citing *Brant*). Manuela knew all about the 1996 Deed, which she signed and later corrected. *See, e.g.*, *Dressel v. Weeks*, 779 P.2d 324, 330 (Alaska 1989) (collecting cases holding that a properly recorded title normally precludes an equitable estoppel claim against the title owner). Manuela cannot claim ignorance about the record title to the Disputed Minerals.

Similarly, Hipolito's silence about ownership of the Disputed Minerals was not enough to create an estoppel. *See, e.g.*, *Klein v. Dove*, 107 A.2d 82, 87 (Md. 1954) ("[I]t is well settled that mere silence as to rights of record does not create an estoppel."); *Tissino v. Mavrakis*, 228 P.2d 106, 117 (Wyo. 1951) (same); *Olden v. Hendrick*, 13 S.W. 821, 822 (Mo. 1890) ("Mere standing by in silence will not bar one from asserting a title to land which has been spread upon the public records, so long as no act is done to mislead the other party."); *Wiser v. Lawler*, 189 U.S. 260, 268 (1903) ("[I]t would certainly be an exceptional case if a person holding a deed of property which he has placed upon record . . . would be estopped from making his claim thereto by mere silence, since he has a right to rely on the constructive notice given by the record; although the rule would

be otherwise in a case of positive misrepresentations upon his part.").

Ms. Hougland did not satisfy the essential elements of her estoppel claim. Indeed, if anyone is estopped in this case, it is Manuela's probate estate. After all, Manuela's failed (twice!) to disclose her alleged ownership of the Disputed Minerals in her bankruptcy cases. Such failures, if found to be intentional, can be grounds for imposing judicial estoppel. *Eastman v. Union Pac. R. Co.*, 493 F.3d 1151, 1157-58 (10th Cir. 2007). Furthermore, the equitable doctrine of estoppel by deed arguably prevents Manuela's estate from claiming ownership of the Disputed Minerals. *See, e.g., Trujillo v. CS Cattle Co.*, 790 P.2d 502, 507 (N.M. 1990) (estoppel by deed bars "a party to a deed . . . from asserting . . . any right or title in derogation of the deed, or from denying the truth of any material fact in it").

Conclusion

The 1996 Deed conveyed the Disputed Minerals to Hipolito. Without a deed signed by Hipolito or a court order, Manuela was powerless to un-ring that bell. Her 1998 Deed and later clarification letter, affidavit, and mineral deed were ineffective to do so. Estoppel principles may prevent Manuela's estate from asserting ownership of the Disputed Minerals but they do not prevent Hipolito's estate from defending its record ownership. The Court will enter a separate final judgment consistent with this opinion.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered December 11, 2020
Copies to: Counsel of Record